Dominick MANCINI, Appellant,

v.

Sherwin LESTER and David Lucas.

No. 79–2218.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule
12(6) Aug. 11, 1980.

Decided Sept. 18, 1980.

· William N. Dimin, Walsh, Sciuto & Dimin, Hackensack, N. J., for appellant.

Dominick Mancini, pro se.

John J. Degnan, Atty. Gen. of New Jersey, Trenton, N. J., for defendants; Erminie Conley, Asst. Atty. Gen., of counsel; John R. Tassini, Deputy Atty. Gen., on brief.

Before ADAMS, VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

PER CURIAM:

This *pro se* civil rights action, brought pursuant to 42 U.S.C. § 1983, presents the difficult question of when a prosecutor is entitled to the defense of absolute immunity.

I.

Plaintiff, Dominick Mancini, was formerly employed as a lieutenant detective in the Bergen County Prosecutor's office. Named as defendants in the complaint filed on September 26, 1978 were Sherwin Lester, Bergen County Prosecutor, and Deputy Attorney General David Lucas. Mancini specifically asserted that "each and all of the acts

of the defendants were done by them, not as individuals, but under the color and pretense of the laws of the State of New Jersey. . . ."

Mancini claimed that his ex–wife had been responsible for making false charges against him during a six–month period between May and September 1972. Mrs. Mancini allegedly presented these charges to Mancini's employer (the Bergen County Prosecutor's Office) as well as the Internal Revenue Service, the New Jersey State Police, and the United States Attorney General's Office. She telephoned the prosecutor's office up to six times daily and "threatened . . . that she would go to the police if I [plaintiff] was not fired."

Plaintiff's pleading also complained that the defendants unreasonably questioned him about his ex–wife's allegations without advising him of his rights; that they ordered him to take a polygraph test and threatened that if he declined severe consequences would result, such as an indictment; that they refused to grant him a leave of absence, although his physicians indicated that without one he would suffer a complete collapse; that they refused to grant him leave unless he submitted his resignation; that his wife retracted the charges made against him; that he was forced to resign and thereafter was "black balled" from obtaining any further job in law enforcement; that plaintiff has incurred loss of earnings of $60,000; and that in attempting to rescind his resignation he sustained substantial legal fees. The defendants were said to have violated Mancini's due process rights and his right to equal protection of the law in violation of the Fourteenth Amendment. Mancini claimed entitlement to compensatory damages as well as punitive damages.

When the prosecutor refused to permit Mancini to rescind his resignation, Mancini brought the matter to the attention of the New Jersey Civil Service Commission. The Commission, emphasizing Mancini's marital difficulties, found that he had submitted his resignation under "duress" and should be allowed to withdraw it.[1]

The Appellate Division of the Superior Court reversed the Commission's judgment and specifically affirmed the prosecutor's decision "in rejecting Mancini's attempted rescission of his resignation. . . ." The appellate court wrote:

> Whether [Mrs. Mancini's] charges were in fact true is irrelevant . . . the point is that the Prosecutor had the right to proceed as he did in investigating respondent, based upon the evidence before him. Since his actions in this regard were fully justified, and since there is not the slightest suggestion that the Prosecutor was not acting in good faith, there was no wrongful or illegal pressure and therefore no duress stemming from his investigation or proposed removal proceedings.

Unpublished opinion at pages 5–6.

Mancini's petition for certification to appeal the Superior Court decision was denied by the Supreme Court of New Jersey. *Woodcock v. New Jersey Civil Service Commission*, 69 N.J. 77, 351 A.2d 5 (1975).[2]

It was then that plaintiff filed his civil rights complaint in the United States District Court for the District of New Jersey. After reviewing the defendants' brief and hearing oral argument, the district court dismissed plaintiff's case on June 26, 1979. It explained the basis of its decision: "After reading all of the moving papers in this case and having had the benefit of oral arguments, this Court finds that these Defendants enjoy prosecutorial immunity." [3]

---

1. The Commission also relied upon the "pressure" put upon Mancini by the Prosecutor's request that he submit to a polygraph test or face certain "unfavorable consequences."

2. There has been filed with the Court the unpublished opinion in *Woodcock, Bergen County*

*Prosecutor v. Mancini*, Sup.Ct.N.J. (Aplt.Div. No. A–881–74, decided 7 July 1975).

3. There is evidence in the transcript that both defendant prosecutors are now state court judges. *See* Doc. No. 16 at page four (4), 11.21–22.

Mancini filed a timely appeal. We now vacate the judgment and remand the matter to the district court.

## II.

The United States Supreme Court's decision in *Imbler v. Pachtman*[4] extended absolute immunity to prosecutors when their "activities were intimately associated with the judicial phase of the criminal process." 424 U.S. at 430, 96 S.Ct. at 995. The state prosecutor in that case had been charged in a suit under § 1983 with the knowing use of perjured testimony. The Supreme Court's decision was a narrow one: "We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 431, 96 S.Ct. at 995. It left open the question, however, whether immunity was required "for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430–431, 96 S.Ct. at 995. (footnote omitted).

The lower federal courts must employ a functional analysis to determine whether *Imbler's* absolute immunity protects a prosecutor. Many of the reported decisions have held that only a qualified, good faith immunity applies to a prosecutor acting in an investigative or administrative capacity. *See, e. g., Jacobson v. Rose*, 592 F.2d 515, 524 (9th Cir. 1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298; *Briggs v. Goodwin*, 569 F.2d 10, 16 (D.C.Cir.1977) (collecting cases at page 20; qualified, good–faith immunity applies to acts done in administrative or investigative capacity), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133; *Pflaumer v. United States Dept. of Justice*, 450 F.Supp. 1125, 1133 (E.D.Pa.1978) (the gathering of evidence for the purpose of supporting the presentation of an indictment is part of the prosecutor's investigative role and therefore entitled to qualified rather than absolute immunity); *D'Iorio v. County of Delaware*, 447 F.Supp. 229, 235 (E.D.Pa.1978) (qualified immunity), *vacated on other grounds*, 592 F.2d 681 (3d Cir. 1979); *Austin v. Manlin*, 433 F.Supp. 648 (E.D.Pa.1977) (qualified immunity applies to prosecutor's investigative role); *Tomko v. Lees*, 416 F.Supp. 1137 (W.D.Pa. 1976).

This Court's most recent consideration of the *Imbler* decision occurred in *Forsyth v. Kleindienst*, 599 F.2d 1203 (3d Cir. 1979), *pet. for writ of certiorari pending sub nom. Mitchell v. Forsyth*, S.Ct. No. 79–1120. At issue in *Forsyth* was a claim of absolute prosecutorial immunity by two former Attorneys General of the United States, who had been named as defendants in a suit for damages filed under the First, Fourth, Sixth, and Ninth Amendments to the Constitution, and 18 U.S.C. § 2520 (1976) (provision for a private cause of action and damages for violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968). Former Attorney General Mitchell contended that he was absolutely immune from civil liability for his decision to authorize warrantless electronic surveillances. Relying upon *Imbler*, he analogized his position to that of a state prosecuting attorney, and argued that because their positions were similar, he too should be entitled to the shield of absolute immunity.

Speaking for the Court, Judge Hunter evaluated this claim against "the boundaries to [the] immunity" established by the Supreme Court. He concluded that cases in other circuits both before and after *Imbler* had "distinguished between a prosecutor's quasi–judicial functions on the one hand and his investigative and administrative functions on the other, granting absolute

In *D'Iorio v. Delaware County*, 592 F.2d 681 (3d Cir. 1978) this Court recognized that local government officials may be suable in their official capacity for money damages or other monetary equitable relief except where the imposition of such liability would amount to the imposition of *respondeat superior* liability on a local government unit not itself suable under the Supreme Court's recent decision in *Monell v. Dept. of Social Services. See* 592 F.2d at note 14.

4. 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

immunity to the former and relegating the latter to qualified immunity." 599 F.2d at 1213–1214 (citations omitted). Surveying the decisions of this Court on the issue, Judge Hunter found that we have "not been squarely presented with the problem of the scope of immunity for prosecutorial conduct which lies outside of the advocatory function but within a prosecutor's duties as an administrator or investigator." *Id.* at 1214.[5]

■ *Forsyth* formally recognized the advocatory investigative distinction stating that we hold that where the activities of the Attorney General depart from those which cast him in his quasi–judicial role, the protection of absolute immunity will not be available." 599 F.2d at 1214–1215. The defendant's actions in *Forsyth* were characterized as being within the "gray" and "difficult" area of investigative activity preceding a prosecution. The following discussion in *Forsyth* sheds light on the case at hand:

> We recognized that the decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made. To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decision-making and the potential for needless actions. We believe that the right to make the decision without being subject to suit must include some limited right to gather necessary information. At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of the prosecutor's investigative activities. We hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi–judicial immunity afforded to the decision itself.

\* \* \* \* \* \*

Our reading of *Butz* and *Imbler* leads us to the conclusion that the Attorney General's decision to authorize the warrantless electronic surveillances is protected by the shield of absolute immunity when it is made in the context of a quasi–judicial function; however, when the decision arises in the context of a purely investigative or administrative function, the decision will not be protected by absolute immunity. We foresee that a limited factual inquiry may in some cases be necessary to determine in what role the challenged function was exercised. We recognize that this may result in some dilution of the protection of absolute immunity. However, this approach is necessary to protect fully the government official performing a protected function; at the same time, we must permit a private remedy to those whose constitutional rights were violated by an official acting outside the scope of absolute immunity.

599 F.2d at 1215 (footnotes omitted). The Court then remanded the case to the district court so that it could apply the above test. We believe that a similar course should be followed here.

In the present situation it does not appear that the district court evaluated the

---

5. The cases reviewed by Judge Hunter included *Brawer v. Horowitz*, 535 F.2d 830 (3d Cir. 1976) and *Helstoski v. Goldstein*, 552 F.2d 564 (3d Cir. 1977). In *Brawer*, the Court was confronted with allegations that a federal prosecutor had knowingly used perjured testimony. Absolute immunity was applied as the allegations "all related to [the prosecutor's] actions in his role as an advocate, rather than as an administrator or investigator." 535 F.2d at 834. In *Helstoski*, we considered the immunity available to a federal prosecutor in a suit alleging that he deliberately "leaked" false information about the plaintiff to damage the plaintiff's political prospects. While finding it unnecessary to decide whether absolute immunity protected a United States Attorney's administrative and investigative functions, the Court held that for some conduct a prosecutor may be entitled only to a qualified immunity: "It would appear that [the deliberate leaking of false information], if it occurred would lie outside of the rationale for absolute immunity set forth in *Imbler*." 552 F.2d at 566.

allegations in light of the functional test set forth in *Forsyth.* Indeed, the factual record is sketchy. The district court was *without* affidavits from the defendants in support of the motion to dismiss (styled in the alternative as a motion for summary judgment), and the hearing which occurred on June 25, 1979 was limited to argument by Mancini and defense counsel. Although it is often difficult to draw lines within the "gray" area of investigatory activity prior to a prosecution,[6] as we see it, the following factors are to be considered in applying to this case the analysis prescribed in *Imbler* and *Forsyth*:

1) Mancini alleged that on September 19, 1972 Lucas questioned him regarding his wife's "allegations." Lucas referred to Mancini as the "defendant" but did not advise him of his "rights."

2) At a meeting with both defendants on September 22, 1972 Mancini was told to take a polygraph test or face "severe consequences . . . [such as] that I would get indicted, fired or brought up on charges."

3) In the face of a medical opinion advising Mancini to take a period "of complete mental and physical rest," the defendants refused to allow a leave of absence unless Mancini submitted his resignation, which he did.

4) No criminal charges were ever pressed against Mancini as a result of his wife's allegations.

5) In *oral argument* to the district court, defense counsel contended that absolute prosecutorial immunity was applicable to protect defendants "from any liability in connection with the investigation of this matter and that's exactly what it was."

These factors appear to point to the exercise by the defendants here of functions in the administrative/investigative area. As was the case in *Forsyth*, however, the record on appeal here does not contain a reasoned explication of the district court's analysis and conclusion in this regard. In evaluating defendants' claim of absolute immunity, it therefore may be helpful to turn to the arguments that were presented to the district court and which are repeated on appeal.

■ Defense counsel that the defendants are entitled to immunity under the express provision of the New Jersey Tort Claims Act. He apparently contends that a New Jersey state statute could immunize the defendants from a violation of plaintiff's federal constitutional rights. The New Jersey Superior Court has rejected an identical argument based upon the provisions of this state regulation:

Defendants claim immunity under the New Jersey Tort Claims Act, which, by express language, excuses municipalities and their officials from liability with respect to discretionary acts.

The act is not a bar to this suit. This cause involves federal rights. These rights cannot be denied by the passage of state legislation. If the contrary were true, every state could deprive its citizens of the very rights which enactments of the Federal Congress are designed to protect. As then Judge Stevens points out in *Hampton v. Chicago*, 484 F.2d 602 (7th Cir. 1973), *cert. den.*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974):

**6.** Indeed, while leaving open the question of whether a prosecutor is entitled to absolute immunity for other actions, Justice Powell made the following comments in *Imbler*:

We recognize that the duties of the prosecutor in his role as an advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. 27 . . These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants,

which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them. 424 U.S. at 431 n.33, 96 S.Ct. at 995 n.33.

The district court erroneously relied on the Illinois Tort Immunity Act. Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. (citation omitted)

*T & M Homes, Inc. v. Township of Mansfield*, 162 N.J.Super. 497, 393 A.2d 613, 618 (Super.Ct. Law Div.1978).

Furthermore, the common law of New Jersey has for many years refused to extend absolute immunity to state prosecutors. *See, e. g., Earl v. Winne*, 14 N.J. 119, 101 A.2d 535 (1953) (action against Bergen county prosecutor and two of his detectives). While the defendants' brief argues at length about the immunity afforded in the state act, it omits any discussion of N.J.S.A. 59:3–14, an exception to the public employee's immunity.

a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.

b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.

*See Cashen v. Spann*, 66 N.J. 541, 334 A.2d 8 (N.J.1975) (prosecutor enjoyed immunity in absence of showing that he acted out of personal motive, with malicious intent, or in excess of his jurisdiction).

Defendants claim that the "hearing" conducted by them which culminated in Mancini's resignation "shares enough of the characteristics of the judicial process that those who participate in such adjudication should (also) be immune from suits for damages." Brief 344 A.2d at 10, citation omitted. This argument apparently relates to the September 1972 meetings outlined in Mancini's complaint. The transcript of the hearing before the district court indicates that the meetings in September 1972 took place in the defendants' office, but we can find no factual support for the proposition that some sort of formal, adjudicative proceeding was convened at that time. While the introduction of affidavits and additional evidence may clarify this issue and lend support to the argument, we are unable on the basis of the present record to conclude that the defendants in fact were serving at the critical times in question in a quasi–judicial capacity.

In a footnote at page eleven of their brief, appellees argue that they "are certainly protected here by a qualified immunity *as they have been found to have acted in good faith. Woodcock, supra*, page 5." (emphasis added) In its unpublished opinion regarding the prosecutor's refusal to allow Mancini to withdraw his resignation, the Superior Court wrote:

Whether the charges were in fact true is irrelevant (and is still undetermined); the point is that the Prosecutor had the right to proceed as he did in investigating respondent, based upon the evidence before him. *Since his actions in this regard were fully justified, and since there is not the slightest suggestion that the Prosecutor was not acting in good faith, there was no wrongful or illegal pressure and therefore no duress stemming from his investigation or proposed removal proceedings.* (emphasis supplied)

Defendants urge that this ruling must be applied as a matter of *res judicata*. Unfortunately, they did not introduce the record of the proceedings that took place before the New Jersey Superior Court as part of the record in this case. The failure to do so undermines the defendants' argument for several reasons. First, the question of good faith is a mixed question of fact and law, and this Court may make such a determina-

tion only after independent examination of the record in question. Second, it appears that the discussion of good faith arose in the New Jersey court for a different purpose and involved an inquiry distinct from that which must be made in the context of a qualified immunity defense in a § 1983 suit. The full record may clarify the extent to which the two issues overlap. Third, the opinion of the Superior Court is not entirely conclusive on the good faith question, for that court *also* recognized that the prosecutor's request that Mancini take a polygraph examination "may well have been wrongful." *See* unpublished opinion at page six. The Superior Court made an independent examination of the record and concluded that the Commission's finding "that the request to take the test was a valid basis for its finding of duress could not 'reasonably have been reached on sufficient credible evidence in the record.'" (citation omitted). Furthermore, the Superior Court found that Mancini's resignation was "freely and voluntarily submitted to avoid the threatened disciplinary proceedings and to obtain a three-month leave of absence without pay." The allegations in this case contradict that determination. Mancini claims that he was told by his physician that he needed the rest and that the defendants allegedly told him he could receive it only by submitting his resignation. While the state court record may, upon examination, provide sufficient information to support a determination of qualified, good-faith immunity, we are unable to reach such a determination at this time on the basis of the record available here.

The only other defense theory presented to the district court was the expiration of the statute of limitations. Mancini's complaint was filed within the six-year period of limitations applicable to contract actions, but defendants contended that the two-year period which controls personal injury actions should govern the case. The record is not clear on this point, and it is also significant that the complaint appears to allege a continuing violation: "At the direction of the defendants, I was forced to resign my position from the Prosecutor's Office and [I] have been black balled from obtaining a job in law enforcement despite my prior seventeen years of unblemished record because of their unqualified recommendations from my superiors in the Prosecutor's Office."

Defendants' arguments are not sufficient to establish absolute immunity on the basis of the existing record. The district court must further develop the facts and apply to them the functional test of *Imbler* and *Forsyth.*

Accordingly, the judgment of the district court will be vacated and the matter remanded for additional proceedings consistent with this opinion.